**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 14-21619-CIV-ALTONAGA/O'Sullivan**

**TAJHON B. WILSON**,

      Petitioner,

vs.

**MICHAEL D. CREWS**,

      Respondent.

_____/

<u>**ORDER**</u>

**THIS CAUSE** came before the Court on Magistrate Judge John J. O'Sullivan's Report

and Recommendation ("Report") [ECF No. 33], entered December 16, 2014. On May 5, 2014,

Petitioner, Tajhon Wilson ("Wilson") filed a Petition Under 28 U.S.C. section 2254 for Writ of

Habeas Corpus by a Person in State Custody ("Petition") [ECF No. 1], on the basis he received

ineffective assistance of counsel. Pursuant to 28 U.S.C. section 636(b)(1), Federal Rule of Civil

Procedure 72, and the Magistrate Rules of the Local Rules of the Southern District of Florida, the

undersigned referred the Petition to Judge O'Sullivan for a report and recommendation. (*See*

[ECF No. 9]).

      In the Petition, Wilson argues he received ineffective assistance as his trial lawyer (1)

failed to conduct an adequate *voir dire* of a juror and failed to strike the juror when there was a

reasonable doubt as to his ability to be impartial (*see* Pet. 4); (2) misadvised Wilson of the

consequences of testifying in his own defense (*see id.* 6); (3) failed to investigate and call four

material witnesses to testify Wilson had an alibi (*see id.* 7); and (4) failed to conduct a reasonable

pre-trial investigation to prove Wilson had gold teeth long before the commission of the charged

offense (*see id.* 9).   The parties engaged in several rounds of briefing on the timeliness of the Petition.   (*See* [ECF Nos. 13,[1] 16, 18, 23, 26, 29]).   On October 14, 2014, Respondent, Michael D. Crews, Secretary of the Florida Department of Corrections ("State"), filed a Memorandum of Law Addressing the Merits ("State Response on Merits") [ECF No. 31].   On October 21, 2014, Wilson filed a Reply . . . ("Wilson Reply on Merits") [ECF No. 32].   In his Report, Judge O'Sullivan finds the Petition is timely and recommends it be denied on the merits.   (*See* Report 1).   On January 23, 2015, Wilson filed a Notice of Filing Objections ("Objections") [ECF No. 36].

When a magistrate judge's "disposition" has properly been objected to, district courts must review the disposition *de novo*.   FED. R. CIV. P. 72(b)(3).   "[T]he plain language of the statute governing review [of the Report] provides only for *de novo* review of 'those portions of the [Report] . . . to which objection is made.'"   *Wanatee v. Ault*, 39 F. Supp. 2d 1164, 1169 (N.D. Iowa 1999) (quoting 28 U.S.C. § 636(b)(1) (alterations added)).   As such, the "[f]iling of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to [the Report]."   *Outwater for McClinchey v. Sec'y of Health & Human Servs*, 894 F. Supp. 1114, 1120 (E.D. Mich. 1995) (alterations added; citations omitted).   When no party has timely objected, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."   FED. R. CIV. P. 72 advisory committee's notes (citation omitted).   The Court has carefully reviewed the parties' filings, pertinent portions of the criminal file, and applicable law.

# I. BACKGROUND

On January 31, 2006, Wilson was charged with robbery using a deadly weapon or firearm

---

[1] The State filed Appendices A–AU [ECF Nos. 13-1, 2, 3, 4, 5, 6, 7] as part of its June 26, 2014 Response to Order to Show Cause [ECF No. 13].  All citations to appendices refer to these documents.

in case F05-39150, in the State of Florida Circuit Court of the Eleventh Judicial Circuit.  (*See* Report 2).  Wilson's jury trial took place from April 29 through April 30, 2008.  (*See id.* 2; Trial Transcript [ECF No. 30-1, 30-2]).  The State presented the testimony of Hugo Isas, a clerk at the adult video store and victim of the robbery that occurred on September 19, 2005.  (*See* Report. 4–5).  Mr. Isas testified as to his identification of Wilson in a photo-lineup about one month after the robbery and made an in-court identification of Wilson as the man who robbed him.  (*See id.* 5).

The State also presented the testimony of Detective Michael Jones, the officer who responded to the robbery.  (*See id.* 5–6).  Detective Jones testified about the description of the robber given to him by Mr. Isas on the night of the robbery and the photo-lineup, and also explained the video surveillance system at the video store was not working the night of the robbery.  (*See id.* 6).  Additionally, the State's latent examiner testified two fingerprints lifted by the State's crime scene technician at the adult video store did not have any value and could not be used to make a positive identification.  (*See id.* 6–7).

Wilson did not testify and did not call any witnesses.  (*See id.* 9).  After the State rested its case, the state court questioned petitioner concerning his decision not to testify at trial.  (*See id.* 7–8).  Wilson's trial counsel, Mr. Ira Still, moved for judgment of acquittal on the basis the state failed to prove any identification of Wilson as the robber, which was denied based on Mr. Isas's testimony.  (*See id.* 8–9).  On April 30, 2008, the jury found Wilson guilty of robbery while in possession of a firearm.  (*See id.* 10).  On June 6, 2008, Wilson was sentenced to a term of life in prison as a prison releasee reoffender.  (*See id.*).

On May 17, 2010, Wilson filed his first motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850, arguing Mr. Still rendered ineffective assistance of

counsel on the same grounds raised in the present Petition.[2]  (*See id.* 11–14).  On January 21, 2011, the state court entered an order summarily denying claims 1, 2, and 5 without an evidentiary hearing.  (*See id.* 11; Eleventh Judicial Circuit Order Denying Claims 1, 2, and 5 ("Order on Claims 1, 2, and 5 of Rule 3.850 Motion") [ECF No. 13-4 (App. Y)]).  On February 25, 2011 and April 1, 2011, the state court held an evidentiary hearing on claims 3 and 4.  (*See* Report 12).  On April 8, 2011, the state court entered an order denying these claims.  (*See id.* 13; Eleventh Judicial Circuit Order Denying Claims 3 and 4 ("Order on Claims 3 and 4 of Rule 3.850 Motion") [ECF No. 13-5 (App. AC)]).

The Florida Third District Court of Appeal issued a *per curiam* opinion affirming the state court's ruling.  (*See* Report 14; Third District Court of Appeal Order Affirming Denial of Rule 3.850 Motion [ECF No. 13-6 (App. AG)]).  Subsequently, Wilson filed a motion to correct illegal sentence, an appeal of the order denying his motion to correct illegal sentence, and a *pro se* petition for writ of habeas corpus alleging ineffective assistance of appellate counsel.  (*See* Report 14–15).  All were unsuccessful.  (*See id.*).  On May 5, 2014, Wilson filed the Petition in this case.  (*See generally* Pet.).

## II. ANALYSIS

### A. Timeliness

Originally there was a dispute between the parties concerning the timeliness of the Petition under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") one-year limitations period.  *See* 28 U.S.C. § 2244(d)(1).  However, after the parties' briefing, and Judge O'Sullivan's thorough and well-reasoned analysis wherein he concludes the Petition is timely

---

[2] In his first motion for postconviction relief, Wilson made a fifth argument of ineffective assistance of counsel based on Mr. Still's failure to make an adequate motion for judgment of acquittal, which is not raised in the Petition.  (*See* Defendant's Motion for Post Conviction Relief ("Rule 3.850 Motion") 21 [ECF No. 13-4 (App. T)]).

(*see* Report 23–34), no objections to this finding have been made.  Having reviewed the Report, the briefing, and the record, the undersigned can discern no clear error and agrees with Judge O'Sullivan's analysis and recommendation on this issue.  The Court proceeds to address the merits of the Petition.

### B. Merits of the Petition

A district court may not grant an application for a writ of habeas corpus on behalf of a person in state custody with respect to any claim adjudicated on the merits in state court unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).[3]  A state court's summary rejection of a claim, without discussion, qualifies as an adjudication on the merits under Section 2254(d) and therefore warrants deference.  *See Wright v. Sec'y for Dep't of Corrs.*, 278 F.3d 1245, 1254 (11th Cir. 2002) ("[T]he summary

---

[3] Section 2254(d)(1)'s "contrary to" and "unreasonable application" clauses are separate bases for reviewing a state court's decision.  As explained in *Putman v. Head*, 268 F.3d 1223 (11th Cir. 2001), a state court decision is "contrary to" clearly established federal law if either:

> (1) the state court applied a rule that contradicts the governing law set forth by Supreme Court case law, or (2) when faced with materially indistinguishable facts, the state court arrived at a result different from that reached in a Supreme Court case.

*Id.* at 1241 (citation omitted).  A state court conducts an "unreasonable application" of clearly established federal law if:

> it identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case. . . . [or] unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context.  Notably, an "unreasonable application" is an "objectively unreasonable" application.

*Id.* (alterations added; internal citations and footnote call number omitted).

nature of a state court's decision does not lessen the deference that is due." (alteration added; citations omitted)); *see also Parker v. Sec'y for Dep't of Corr.*, 331 F.3d 764, 776 (11th Cir. 2002) ("All that is required under § 2254(d)(1) is an adjudication on the merits, not a full state court opinion." (citations omitted)).

Under the AEDPA, a trial court's findings of fact are presumed correct absent "clear and convincing evidence" to the contrary. 28 U.S.C. § 2254(e)(1); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2) . . . ." (citation omitted)).

The Petition raises claims of ineffective assistance of trial counsel. To prevail on an ineffective assistance of counsel claim under the two-prong test enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984), a petitioner must show counsel's representation (1) was deficient, falling below an objective standard of reasonableness; and (2) but for counsel's deficiency, there is a reasonable probability the result of the proceeding would have been different. *See id.* at 687–88, 694.

With regard to evaluating counsel's performance, courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *id.* at 689 (citation omitted), and counsel "made all significant decisions in the exercise of reasonable professional judgment," *id.* at 690. "The challenger's burden is to show that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Harrington v. Richter*, 562 U.S. 86, 104 (2011)

Case No. 14-21619-CIV-ALTONAGA/O'Sullivan

(internal quotation marks and citation omitted).  In other words, "a petitioner must establish that no competent counsel would have taken the action that his counsel did take." *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (footnote call number and citations omitted); *see also Harvey v. Warden*, 629 F.3d 1228, 1239 (11th Cir. 2011) ("[T]rial counsel's error must be so egregious that no reasonably competent attorney would have acted similarly." (alteration added; citation omitted)).

"In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." *Harrington*, 562 U.S. at 111 (citations omitted).  Rather, "*Strickland* asks whether it is reasonably likely the result would have been different. . . . The likelihood of a different result must be substantial, not just conceivable." *Id.* at 111–112 (alteration added; internal quotation marks and citations omitted).

"[W]hen the state courts have denied an ineffective assistance of counsel claim on the merits, the standard a petitioner must meet to obtain federal habeas relief was intended to be, and is, a difficult one." *Johnson v. Sec'y, Dep't of Corr.*, 643 F.3d 907, 910 (11th Cir. 2011) (alteration added) (citing *Harrington*, 562 U.S. at 102).  "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington*, 562 U.S. at 102–03 (internal quotation marks and citation omitted).  Under the "double deference required by § 2254 and *Strickland* . . . 'the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.'" *Jones v. Sec'y, Dep't of Corr.*, 487 F. App'x 563, 565 (11th Cir. 2012) (alteration added; internal citations omitted) (quoting *Harrington*, 562 U.S. at 105).

7

Wilson's four claims of ineffective assistance of counsel were adjudicated on the merits by the state court; he raises an additional argument that the cumulative effect of his counsel's errors renders the assistance ineffective.  (*See* Memorandum of Law and Fact Supporting Petition ("Memorandum Supporting Petition") 17 [ECF No. 1-2]).[4]  In the Report, Judge O'Sullivan determines Wilson does not demonstrate the state court's denials of his claims were contrary to, or an unreasonable application of, *Strickland* or other clearly established federal law, or that the state court's decisions were based on an unreasonable determination of the facts.  (*See generally* Report).  Judge O'Sullivan recommends the Petition and Wilson's request for an evidentiary hearing be denied.  (*See id.* 1, 23).

### 1. Ineffective Assistance of Counsel in Failing to Conduct an Adequate *Voir Dire* and Strike Juror Canto

Wilson argues his trial counsel's performance was constitutionally deficient in that counsel failed to adequately question a juror, Mr. Canto, during *voir dire*, and failed to strike Mr. Canto for cause or through a peremptory.  (*See* Pet. 4).  According to Wilson, he was prejudiced by this deficient performance because Mr. Canto was biased and he served as the foreman on a jury that returned a guilty verdict.  (*See id.* 5).

The relevant facts are as follows.  During jury selection, the trial judge addressed a different juror about her concerns she would miss an important phone call and her statement that she would do her best to pay attention to the case and not be distracted.  (*See* Trial Tr. 32).  During this exchange, the judge gave the following analogy:

> Okay.  All right.  Well, we will do the best that we can, but you said something there that was kind of interesting.  You said that you will do your best.  I know

---

[4] Although the parties concurred Wilson exhausted all state court remedies that are available for challenging his state conviction (*see* Report 19), this particular legal claim does not appear to have been raised in Wilson's motion for postconviction relief (*see* Rule 3.850 Motion), or his appeal of the order denying his motion for postconviction relief (*see* Initial Brief of Appellant in Appeal from the Eleventh Judicial Circuit of Florida [ECF No. 13-6 (App. AE)]).

that these are tough questions and I use an example all the time of an airline passenger. You are an airline passenger and the pilot gets on the intercom and says, folks, I am getting ready to land the plane at Miami International Airport. I am going to do my best. You would be nervous looking for parachutes, okay. These are tough questions, but as you have indicated if it is something that you think will bother you we need to know that. So if it is yes or no, please I need you to land that plane. If it is going to bother you we need to know. If you think that you can do it, my officer friend over here Mr. Ross said that he could do it for a day or two, that is not a problem. You seem to think that you can't. That is fine. I need the honesty in the response. That is what we want, the truth. Fair enough?

(*Id.* 32:18–33:9).

Later, the judge had the following exchange with Mr. Canto:

THE COURT: Mr. Canto, how are you?

MR. CANTO: How are you, Your Honor.

THE COURT: You put "stolen bicycle." Is that you or a family or friends?

MR. CANTO: The building bicycle.

THE COURT: Okay. Nothing about that would effect [sic] your ability to be fair and impartial in this case?

MR. CANTO: I don't think so.

THE COURT: You don't think so. Can you land that plane?

MR. CANTO: No, sir.

THE COURT: Okay. No friends in law enforcement?

MR. CANTO: No.

THE COURT: Never been arrested or accused of a crime?

MR. CANTO: No, sir.

(*Id.* 42:8–21).

The state court allowed the attorneys an opportunity to question the potential jurors and Wilson's trial counsel, Mr. Still, had the following exchange with Mr. Canto:

MR. STILL: Let me ask you a question.  How do you feel about the proposition that the State of Florida has the burden to prove the case beyond a reasonable doubt?  I know that you know that that is the principle, but how do you feel about that?

MR. CANTO: I think that everyone should be afforded a fair trial and if that is the case in the State of Florida then it should be done that way.

MR. STILL: Okay.  Okay.  And so not only do you know that that is the law, but you feel that that is a good rule to follow?

MR. CANTO: Yes.

(*Id.* 108:11–22).

After the jury was selected, the Court questioned Wilson:

THE COURT: Mr. Wilson, you went in the privacy of the jury room and discussed the jurors with Mr. Still?

THE DEFENDANT: Yes, sir.

THE COURT: In fact, I saw you making notes here in jury selection with your attorney, right?

THE DEFENDANT: Yes, sir.

THE COURT: Are you satisfied with the jury selection and with Mr. Still?

THE DEFENDANT: Yes, sir.

THE COURT: Nobody forced you to accept any particular juror?

THE DEFENDANT: No, sir.

THE COURT: Nobody promised you anything to get you to accept any particular juror?

THE DEFENDANT: No, sir.

THE COURT: You are not suffering from any mental disease or disorder; correct?

THE DEFENDANT: No.

THE COURT: Not under the influence of any drugs or alcohol; right?

THE DEFENDANT: No.

THE COURT: Good luck to you, sir. Okay.

(*Id.* 131:16–132:12).

"'Where a postconviction motion alleges that trial counsel was ineffective for failing to raise or preserve a cause challenge, the defendant must demonstrate that a juror was *actually biased*.' To meet the actual bias standard, 'the defendant must demonstrate that the juror in question was not impartial — i.e., that the juror was biased against the defendant, and the evidence of bias must be plain on the face of the record.'" *Fennell v. Sec'y, Fla. Dep't Corr.*, 582 F. App'x 828, 832 (11th Cir. 2014) (*per curiam*) (alterations and internal citations omitted) (quoting *Carratelli v. State*, 961 So. 2d 312, 324 (Fla. 2007)).

Judge O'Sullivan finds no evidence of bias against Wilson. (*See* Report 37). According to Judge O'Sullivan, Mr. Canto's response of "No, sir" to the trial judge's question, "Can you land that plane," may have been an attempt by Mr. Canto to amend his prior answer of, "I don't think so," to be a more assertive one, rather than an indication he could not be fair and impartial. (*See id.*). As Judge O'Sullivan notes, the trial judge — who was in the position to evaluate Mr. Canto — was apparently satisfied with Mr. Canto's response given he moved on to another area of inquiry immediately thereafter. (*See id.* 38). Further, Judge O'Sullivan finds there is nothing in the record demonstrating Mr. Canto had an actual bias against Wilson, particularly where Mr. Canto told Mr. Still he felt everyone should be afforded a fair trial. (*See id.*).

In reaching his determination that Wilson fails to show the state court's denial of his claim of ineffective assistance of counsel on this basis was contrary to, or an unreasonable application of *Strickland*, Judge O'Sullivan also relies on the fact Wilson was present during *voir dire* and told the trial judge he was satisfied with the jury selection. (*See id.*). Relying on

*Richardson v. State*, 723 So. 2d 910, 911 (Fla. 1st DCA 1999), Wilson argues he did not recognize the significance of Mr. Canto sitting on his jury until after this colloquy occurred and thus, the responses he gave in his colloquy do not refute his allegations of ineffective assistance of counsel.  (*See* Wilson Reply on Merits 16).  *Richardson* involved a defendant whose attorney did not inform him of the available legal defense of voluntary intoxication prior to his burglary plea agreement and plea colloquy, wherein he represented he was satisfied with his attorney's services, and only later became aware of the available legal defense.  *Richardson*, 723 So. 2d at 910.  In that circumstance, "it would be illogical and unfair to foreclose analysis of that claim based upon what (defendant) asserts was an uninformed conclusion that counsel had been adequate in his criminal representation."  *Id.* at 911 (internal quotation marks and citation omitted).  Judge O'Sullivan finds *Richardson* distinguishable, as here "any alleged bias that was reflected in Mr. Canto's responses would have been readily apparent to the petitioner during the jury selection process."  (Report 39).

    In the one line of his objections to the Report's denial of this claim, Wilson takes issue with Judge O'Sullivan construing Mr. Canto's "No, sir" response as a possible attempt to rehabilitate his prior answer.  (*See* Objections 2).  By construing Mr. Canto's response in this manner, Judge O'Sullivan was making the point there is more than one reasonable interpretation of Mr. Canto's "No, sir" response.  (*See* Report 38 n.19).  In other words, in responding "No, sir" to the trial judge's question as to whether he could land the plane, Mr. Canto did not necessarily mean he could definitely not be unbiased.   The undersigned agrees this is a reasonable interpretation of Mr. Canto's response; Mr. Canto's response was not, as Wilson argues, a "clear unambiguous statement that he was not sure he could be neutral."  (Wilson Reply on Merits 14).

"[T]he question of whether a prospective juror is biased is largely one of demeanor, and a prospective juror's demeanor during voir dire may make clear what seems ambiguous on the face of a cold transcript." *Fennell*, 582 F. App'x at 833 (alteration added; internal quotation marks and citation omitted). "Here, none of the people in the best position to evaluate [Mr. Canto's] response appear to have understood him to mean that he could not be impartial." *Id.* (alteration added).

The undersigned has performed a *de novo* review of the record, the parties' filings, and the Report with respect to the objection raised, and is satisfied there is no clear error with respect to Judge O'Sullivan's remaining analysis and recommendation. Based on this review, the undersigned agrees with Judge O'Sullivan that Wilson's claim of ineffective assistance of counsel based on his trial counsel's allegedly inadequate *voir dire* and failure to strike Mr. Canto from the jury should be denied. Wilson has not demonstrated Mr. Canto was actually biased and that his counsel's performance was deficient. The state court's denial of this claim was not contrary to, or an unreasonable application of *Strickland* or other clearly established federal law.

## 2. Ineffective Assistance of Counsel in Misadvising Petitioner of Consequences of Testifying in His Own Defense

Wilson's second basis for claiming ineffective assistance is trial counsel misadvising him regarding the right to testify on his own behalf. (*See* Pet. 6). Wilson claims his decision not to testify was predicated solely on his trial counsel's erroneous advice (1) he would win the case without Wilson needing to testify "because the alleged robbery victim in his case could not and would not identify him in court," and (2) "the State would have the ability to impeach his denial of commission of the instant charged robbery with the introduction of the details of a prior conviction for robbery." (*Id.*). Wilson claims had his trial counsel advised him correctly, he would not have voluntarily waived his right not to testify, he would have taken the witness stand,

and he would have testified he had a valid alibi on the date and time in question and he was actually innocent.  (*See id.*).

After the State rested its case, outside the presence of the jury, the Court questioned Wilson about his decision not to testify, as follows:

> THE COURT: Mr. Wilson, two things.  I am going to question you again.  One thing, I asked you a question a while ago, were you going to testify; you remember that?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Your attorney indicated to me that you have decided not to become a witness.  You are not going to testify; is that correct?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: You are not going to testify?
>
> THE DEFENDANT: No.
>
> THE COURT: You have the absolute right to testify if you choose to; you understand that?
>
> THE DEFENDANT: Yes.
>
> THE COURT: You also have a Constitutional right not to testify if you choose to; you understand that?
>
> THE DEFENDANT: Yes.
>
> THE COURT: You understand the difference between both?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: You have decided not to testify and not to become as [sic] witness?
>
> THE DEFENDANT: That is correct.
>
> THE COURT: Anybody promise you anything to get you to make that decision?
>
> THE DEFENDANT: No, Your Honor.
>
> THE COURT: Nobody forced you?

THE DEFENDANT: No, Your Honor.

THE COURT: You discussed this with Mr. Still?

THE DEFENDANT: Yes.

THE COURT: You are satisfied with his advice as counsel?

THE DEFENDANT: Yes.

THE COURT: Regardless of what his advice is, it is your case and you have decided not to become a witness, right?

THE DEFENDANT: Correct.

THE COURT: Are you under the influence of any drugs or alcohol?

THE DEFENDANT: No, sir.

THE COURT: You are not suffering from any mental disease or mental disorder?

THE DEFENDANT: No.

(Trial. Tr. 206:5–207:18).

Wilson argues his waiver of his right to testify was not "knowingly, voluntarily, and intelligently" made because his counsel's advice that the State would be entitled to inquire into his prior robbery conviction was incorrect.  (Wilson Reply on Merits 18).  Wilson argues this colloquy cannot be relied on to refute the allegations of ineffective assistance of counsel because the factual basis that formed his postconviction claim of ineffective assistance of counsel did not surface until after the colloquy occurred.  (*See id.* 19).

In his Report, Judge O'Sullivan determines, even assuming counsel's performance was deficient, Wilson cannot succeed on his claim because he cannot show prejudice.  (*See* Report 41).  Judge O'Sullivan notes the colloquy concerning Wilson's decision not to testify took place *after* the robbery victim, Mr. Isas, made an in-court identification of Wilson as the man who

robbed the adult video store, and also *after* Detective Jones made an in-court identification of Wilson as the person Mr. Isas had selected from the photo-lineup.  (*See id.* 43).  Because Wilson was in court during the testimony of these witnesses, Judge O'Sullivan finds, "regardless of what the petitioner's counsel told the petitioner concerning the robbery victim's expected testimony, the petitioner knew that Mr. Isas had in fact identified him at trial as the robber at the time the petitioner engaged in this colloquy with the court."  (*Id.*).  Wilson does not challenge Judge O'Sullivan's determination on this issue, and the Court finds no clear error.

With regard to Wilson's reliance on his counsel's incorrect advice that if he testified the State would have the ability to impeach Wilson with details of his prior conviction for robbery, Judge O'Sullivan finds the state court's denial of this claim was not contrary to, or an unreasonable application of *Strickland* or other clearly established federal law.  (*See* Report 46).  In his decision, Judge O'Sullivan discusses *Jones v. Secretary, Department of Corrections*, a case involving a petitioner who sought habeas relief on the basis his trial counsel was ineffective for advising him not to take the stand to support his mistaken identity defense.  *See* 487 F. App'x at 566.  In *Jones*, one of the victims testified he was robbed by a man wearing a short-sleeved shirt, who had no noticeable tattoos, and had one open-faced gold cap in the upper right side of his mouth.  *See id.*  The petitioner in *Jones* described himself as having full-sleeved tattoos and three full-faced gold crowns in the front of his mouth.  *See id.*  Like Wilson, the petitioner in *Jones* argued his counsel was ineffective based on incorrect advice that, if he took the stand, the prosecutor could ask him about the nature and facts of five prior felony convictions.  *See id.* at 567.  If he had taken the stand, the *Jones* petitioner argued, he could have shown the jury his tattoos and three full-faced gold teeth, which would have undermined the testimony of the victim

16

who did not notice tattoos on the robber's arms and who said the robber had one open-faced gold tooth.  *See id.*

Based on the *Jones* petitioner's colloquy with the trial court, the state court found the petitioner willingly agreed not to testify on his own behalf, he made the decision independently, and his lawyer did not force him to make it.  *See id.*  As noted by the Eleventh Circuit, the state court in *Jones* did not address whether, in reaching his decision not to testify, petitioner relied on the misadvice from his trial counsel about what the prosecutor could ask him on cross-examination.  *See id.* 567–68.  The Eleventh Circuit found, even if Jones relied on counsel's misadvice in deciding not to testify, he was not prejudiced because, given the evidence of his guilt presented by the State — testimony that soon after the robbery each of the victims separately identified the petitioner in a photo-lineup as the person with the gun in the home-invasion robbery, and in-court identifications by each of the victims — he could not show a reasonable probability of a different result if he had testified.  *See id.*

Judge O'Sullivan observes the evidence against Wilson "is not as strong as the case against the petitioner in *Jones* where there were multiple victims who identified the petitioner as the man who robbed them." (Report 46).  Nonetheless, Judge O'Sullivan finds, in contrast to the trial proceedings in *Jones*, here, the state court *did* question Wilson about his reliance on his counsel's misadvice.  In the colloquy with the trial judge, Wilson testified it was his decision not to become a witness "[r]egardless of what his [counsel's] advice [was]." (Trial Tr. 207:10–12 (alterations added)).  Based on this colloquy, Judge O'Sullivan determines Wilson's claim should be denied because he cannot show he relied on his counsel's erroneous advice in deciding not to testify at trial.  (*See* Report 46).

In his Objections, Wilson clings to Judge O'Sullivan's observation about the strength of the case against him as compared to the prosecution's case in *Jones* and argues "[t]his concession by the Magistrate [sic] distinguishes *Jones* from the instant case so that reliance on it as a basis for relief is erroneous." (Objections 3). In doing so, Wilson misconstrues the basis of Judge O'Sullivan's finding: Judge O'Sullivan does not rely on the similarity in strength of the prosecutors' cases against Wilson and the *Jones* petitioner as the basis for his finding of no prejudice. Rather, as previously noted, Judge O'Sullivan finds Wilson's solemn declaration made in open court wherein he specifically disavowed any reliance on his counsel's advice — or misadvice — as the reason for his decision not to testify, as the basis for finding no prejudice. (*See* Report 46 (citing *Strickland v. Sec'y Dep't of Corr.*, 8:06-cv-2390-T-24MAP, 2008 WL 686162, at *11 (M.D. Fla. Mar. 10, 2008) (stating that regardless "of trial counsel's advice, it was [the petitioner]'s own informed and knowing decision not to testify. Therefore, [the petitioner] has not shown that counsel's performance was deficient and has not shown prejudice." (alterations added)))).

The undersigned agrees with Judge O'Sullivan's analysis and conclusion and is not persuaded by Wilson's argument that a "colloquy wherein a defendant avers his satisfaction with his attorney's representation does not refute a post conviction claim of ineffective assistance of counsel." (Wilson Reply on Merits 19 (citing *Richardson*, 723 So. 2d at 911, and *Jones v. State*, 846 So. 2d 1224, 1226 (Fla. 2d DCA 2003)). This argument, and the case law it relies on, are inapplicable in this instance as they do not involve a representation to the court that a defendant reached a decision independent of any advice from counsel — a representation that directly rebuts a claim later brought by defendant with the benefit of hindsight. Because the state court's adjudication of this claim was not contrary to or an unreasonable application of clearly

18

established federal law, Wilson's claim of ineffective assistance based on his counsel's erroneous advice is denied.

### 3. Ineffective Assistance of Counsel in Failing to Investigate and Call Four Material Witnesses to Testify Petitioner Had an Alibi

Wilson's third claim of ineffective assistance of counsel is based on his trial counsel's failure to call a "four person alibi [that] was available and willing to testify that Mr. Wilson was with them at all times material to the Cloverleaf robbery, and that he could not possibly have been the robber." (Pet. 7). Wilson contends he told his counsel about these witnesses — John Beamon, Jocelyn James, Detoria Vincent, and Nina Thompkins — and about the substance of their potential testimony, and Mr. Still failed to investigate and call at trial any of them. (*See id.*). But for counsel's deficient performance, Wilson argues, "a reasonable probability exists that a not guilty verdict might have resulted." (*Id.*).

The state court held an evidentiary hearing on February 25, 2011 and April 1, 2011 on this claim. (*See* Feb. 25, 2011 Evidentiary Hearing Transcript ("February Evidentiary Hearing Transcript") [ECF No. 13-5 (App. Z)]; April 1, 2011 Evidentiary Hearing Transcript ("April Evidentiary Hearing Transcript") [ECF No. 13-5 (App. AA)]). In its order denying the claim, the state court noted Wilson "failed to provide an affidavit or sworn statement of John Beamon, Detoria Vincent or Nina Thompkins in support of his motion." (Order on Claims 3 and 4 of Rule 3.850 Motion 2). The state court further noted, at the February 25 evidentiary hearing, counsel for Wilson "advised that in spite of their best efforts, they were unable to present testimony from any witnesses in support of the alibi, and requested that [the court] recess the hearing to give them another opportunity to secure this testimony." (*Id.* (alteration added)). When the hearing reconvened on April 1, counsel "advised that they would not be able to present testimony from

John Beamon, Detoria Vincent or Nina Thompkins, so they were abandoning their argument as to those witnesses." (*Id.*).

The fourth witness, Ms. James, testified at the April 1 hearing that on the day of the robbery, Wilson was living with her in Tampa and attending her niece's birthday party. (*See id.* 2). Ms. James testified she tried to call Wilson's trial counsel, but Mr. Still never returned her calls. (*See id.*). Concerning Ms. James, the state court found:

> The evidence presented by the Defendant through the testimony of Jocelyn James was simply not credible. The witness did not seem honest and straight forward in answering the questions of the attorneys, and there was nothing presented at the hearing to corroborate her account. On the contrary, Mr. Still remembered speaking to the Defendant's girlfriend [Ms. James] and specifically recalled that she was unwilling to come to Miami to testify and had no testimony that would assist the Defendant at trial.

(*Id.* 3–4 (alteration added)). Further, with regard to Mr. Still, the state court noted he testified he never spoke to any credible witness who could support an alibi defense at trial. (*See id.* 3).

Judge O'Sullivan finds the record supports the state court's conclusion Wilson abandoned this claim with respect to witnesses John Beamon, Detoria Vincent, and Nina Thompkins. (*See* Report 49 (citing April Evidentiary Hr'g Tr. at 30[5])). Judge O'Sullivan further

---

[5] The following exchange took place at the April 1 hearing:

> MRS. MARSHALL (postconviction counsel for Wilson): Well, the other witnesses we have listed in the motion who unfortunately aren't present today.
>
> THE COURT: Did you ever get affidavits from them?
>
> MRS. MARSHALL: No, ma'am.
>
> THE COURT: So what evidence do I have that they were available to testify and what their testimony would be?
>
> MRS. MARSHALL: Those witnesses since we are unable to present any evidence as to those witnesses, I am specifically making the argument as to Ms. James testimony today.
>
> THE COURT: Okay.

Case No. 14-21619-CIV-ALTONAGA/O'Sullivan

determines that, even if Wilson did not abandon this argument at the state court evidentiary hearing, Wilson fails to show by clear and convincing evidence these three witnesses would have been available to testify at trial, and therefore Wilson has not met *Strickland*'s prejudice prong. (*See id.* 49–50 (citing *Reed v. Sec'y, Fla. Dep't of Corr.*, 767 F.3d 1252, 1262 (11th Cir. 2014) ("Because the record amply supports the determination that [the witness] was unavailable, we are hard-pressed to find that the outcome of [petitioner's] trial would have been different had [the attorney] investigated [the witness]." (alterations added)).

With respect to Ms. James, Judge O'Sullivan recommends the state court's credibility determinations should not be disturbed, and Wilson has not shown by clear and convincing evidence the state court's determination that his former counsel was a more credible witness than Ms. James was unreasonable. (*See* Report 51). Judge O'Sullivan concludes Wilson "has not shown that the state court's denial of this claim was contrary to, or an unreasonable application of *Strickland* or other clearly established federal law as determined by the Supreme Court of the United States, or that the state court's decision was based on an unreasonable determination of the facts." (*Id.*).

Wilson filed a one page objection to Judge O'Sullivan's recommendations on this claim, in which he makes several vague and confusing arguments that Judge O'Sullivan "erred" in his findings without providing any explanation for why these findings are erroneous. (*See generally* Objections 4). The Court can otherwise discern only one objection: regarding whether he abandoned his claim of ineffective assistance of trial counsel as to witnesses John Beamon, Detoria Vincent, and Nina Thompkins, Wilson argues, "based on the evidentiary hearing

---

MRS. MARSHALL: So we would submit that counsel acted deficiently in failing to call Ms. James and Mr. Wilson suffered prejudice . . .

(Apr. Evidentiary Hr'g Tr. 30:1–12).

Case No. 14-21619-CIV-ALTONAGA/O'Sullivan

testimony of Ms. James, the ground was not waived, and this Court may still consider the ground

on the merits as to the other witnesses based on *Martinez v. Ryan*, 132 S. Ct. 1309 (2012)." (*Id.*).

The Eleventh Circuit recently explained the procedural default doctrine and the decisions

in *Martinez* and *Trevino v. Thaler*, 133 S. Ct. 1911 (2013) (collectively referred to as the

*Martinez* rule):

> Under the procedural default doctrine, if a state prisoner "defaulted his federal
> claims in state court pursuant to an independent and adequate state procedural
> rule, federal habeas review of the claims is barred unless the prisoner can
> demonstrate cause for the default and actual prejudice as a result of the alleged
> violation of federal law . . . ." In general, lack of an attorney and attorney error in
> state post-conviction proceedings do not establish cause to excuse a procedural
> default.
>
> In *Martinez,* the Supreme Court announced a narrow, equitable, and non-
> constitutional exception to *Coleman's* holding (that ineffective assistance of
> collateral counsel cannot serve as cause to excuse a procedural default) in the
> limited circumstances where (1) a state requires a prisoner to raise ineffective-
> trial-counsel claims at an initial-review collateral proceeding; (2) the prisoner
> failed properly to raise ineffective-trial-counsel claims in his state initial-review
> collateral proceeding; (3) the prisoner did not have collateral counsel or his
> counsel was ineffective; and (4) failing to excuse the prisoner's procedural default
> would cause the prisoner to lose a "substantial" ineffective-trial-counsel claim. In
> such a case, the Supreme Court explained that there may be "cause" to excuse the
> procedural default of the ineffective-trial-counsel claim. Subsequently, the U.S.
> Supreme Court extended *Martinez's* rule to cases where state law technically
> permits ineffective-trial-counsel claims on direct appeal but state procedures
> make it "virtually impossible" to actually raise ineffective-trial-counsel claims on
> direct appeal.
>
> Importantly, the *Martinez* rule is expressly limited to attorney errors in initial-
> review collateral proceedings: "[T]he holding in *[Martinez]* does not concern
> attorney errors in other kinds of proceedings, including appeals from initial-
> review collateral proceedings, second or successive collateral proceedings, and
> petitions for discretionary review in a State's appellate courts."

*Lambrix v. Sec'y, Fla. Dep't of Corr.*, 756 F.3d 1246, 1259–60 (11th Cir. 2014) (alterations in

original; internal citations and footnote call numbers omitted). The relevance of *Martinez* in this

context — where Wilson raised and then abandoned his claim of ineffective assistance of

counsel as to these three witnesses — is unclear and is not explained in Wilson's Objections. To the extent Wilson relies on *Martinez* to argue his postconviction counsel was ineffective for abandoning this claim as to witnesses John Beamon, Detoria Vincent, and Nina Thompkins, this argument is not clear and the Court will not engage in this analysis based on a cursory case citation.

The undersigned has performed a *de novo* review of the record, the parties' filings, and the Report with respect to the objection raised, and is satisfied there is no clear error with respect to Judge O'Sullivan's remaining analysis and recommendation to deny this claim.

### 4. Ineffective Assistance of Counsel in Failing to Conduct a Reasonable Pre-Trial Investigation to Prove Petitioner Had Gold Teeth Long Before Commission of the Charged Offense

In his fourth claim, Wilson argues his trial counsel failed to conduct a reasonable pre-trial investigation to obtain dental records proving Wilson had permanent gold teeth[6] prior to the commission of the robbery, which would have undermined Mr. Isas's testimony describing the individual who robbed him as having "big teeth" or "buck teeth" but not specifically gold teeth. (*See* Pet. 9). Wilson claims "but for counsel's inept and unprofessional failure to investigate and obtain his dental records prior to trial, a reasonable probability exists that the 'misidentification' defense would have found validity in the view of the jury and a not guilty verdict might have resulted." (*Id.*).

After the evidentiary hearing on this claim, during which Mr. Still and Wilson both testified and Wilson presented his dental records showing he had his gold teeth since 2001, the state court found the trial strategy described and acted on by Wilson's trial counsel was reasonable and denied the claim. (*See* Order on Claims 3 and 4 of Rule 3.850 Motion 5). In the

---

[6] In his Objections, Wilson explains "Gold-capped teeth are a fashion statement among certain elements of society," can be removable or permanent, and notes "the fact that this decorative feature is a dominant presence on an individual's face is probably uniformly appreciated." (Objections 5 n.2).

Report, Judge O'Sullivan concludes Wilson did not rebut the presumption of correctness due to the state court's factual determination that Wilson's trial counsel made a strategic decision concerning Wilson's gold teeth, and also finds Wilson's trial counsel's strategic decision fell within the wide-range of constitutionally acceptable conduct and was not a violation of *Strickland*'s performance prong.  (*See* Report 56).

Wilson's objections largely repeat arguments previously raised in his several rounds of habeas briefing.  (*See generally* Pet.; Memorandum Supporting Petition; Motion to Supplement Petition [ECF No. 11]; Wilson Reply on Merits).  Wilson contends there is no logical reason to fail to investigate or raise evidence of the permanence and age of Wilson's gold teeth (*see* Objections 5); raising the gold teeth during closing arguments violates Florida rules of evidence "and a violation of the rules can never be held to be sound trial strategy" (*id.* 10); not cross-examining Mr. Isas about the gold teeth because he might change his testimony or "remember" the gold teeth is a "ridiculous reason[] and not within the realm of reasonableness" (*id.* 5); no testimony substantiates the state court's conclusion that trial counsel did not want to run the risk the victim might "remember" or change his testimony as the reason for waiting until closing arguments to mention Wilson's gold teeth (*id.* 7); and "trial counsel's strategy of doing nothing during trial and then waiting until closing arguments to surreptitiously employ a 'gotcha' attack by mentioning [Wilson's] gold teeth at the eleventh hour, which by law, the jury could not consider as evidence, was an egregiously incompetent decision because he did not first lay a proper foundation by introducing the evidence of [Wilson's] gold teeth during trial" (*id.* 10).

The undersigned has thoroughly reviewed the record and briefing as it pertains to this claim and recounts the relevant facts as follows.  At trial, Mr. Isas testified a tall, African American man wearing brown sunglasses and a hat, entered the adult video store on September

19, 2005, took a look around, went to the back of the store, returned, and asked Mr. Isas for change for a twenty dollar bill.  (*See* Trial Tr. 144:24–145:18; 152:19–20).  Mr. Isas handed the man the change, the man turned around like he was going to the back of the store, and then the man turned around again with a gun in his hand.  (*See id.* 145:16–18, 146:4–8).  Mr. Isas testified the man said, in a quiet tone of voice, "give me the money."  (*Id.* 146:2–3).  Mr. Isas opened the register and the man reached in and grabbed some money.  (*See id.* 147:3–5).  Mr. Isas testified that on the way out of the store, the man said "thank you."  (*Id.* 147:1–2).

On cross-examination, Mr. Still elicited testimony from Mr. Isas that he did not know Wilson and had never seen him before the night of the robbery (*see id.* 151:13–24); questioned Mr. Isas about his identification of Wilson in the photo-lineup as the individual who robbed him because Wilson was not wearing sunglasses in the photograph (*see id.* 153:6–15); and questioned Mr. Isas's recollection about the facial features of the individual who robbed him, eliciting testimony that, on the night of the robbery, Mr. Isas was unable to describe the perpetrator's ears, chin, cheeks, eyebrows, and forehead (*see id.* 154:2–16).  Mr. Isas testified that, at the time of his testimony (over two and a half years after the robbery), the only descriptive characteristics he recalled were the individual's height, the brown sunglasses, and his big teeth.  (*See id.* 158:5–9).  On re-direct, Mr. Isas testified what caught his attention was the individual's mouth and he had the opportunity to observe the robber's mouth because the individual spoke with him during the robbery.  (*See id.* 158:18–24).  On re-direct, Mr. Isas also testified he was certain Wilson was the individual who robbed him.  (*See id.* 160:19–22).

At trial, the State also presented the testimony of Detective Michael Jones, the officer who responded to the robbery.  (*See* Report 5–6).  Detective Jones testified about the description of the robber given to him by Mr. Isas on the night of the robbery, particularly how Mr. Isas

described the individual who robbed him as a "blake [sic] male, approximately six feet tall, medium complexion, 25 to 27 years of age wearing a ski cap on the top of his head, a black shirt and camouflage pants" and "that this individual had buck teeth."   (Trial Tr. 173:13–18). Detective Jones also testified about the photo-lineup — presented to Mr. Isas one month after the date of the robbery (*see id.* 155:9–16) — specifically how Mr. Isas viewed each photograph carefully and after about twenty or thirty seconds, without any uncertainty, Mr. Isas pointed out the man who robbed him.   (*See id.* 177:13–178:2).   Detective Jones made an in-court identification of Wilson as the person Mr. Isas had selected from the photo-lineup.  (*See id.* 177:6–14).

On cross-examination, Mr. Still questioned Detective Jones about the fact Wilson's teeth are not showing in his photograph in the photo-lineup[7] (*see id.* 179:11–13), and Detective Jones answered "Yes" to Mr. Still's question that "the one identifying characteristic that the victim gave [Detective Jones] that matched up with the photograph" was that the photograph showed a black male.  (*Id.* 179:14–20 (alteration added)).   Detective Jones also responded, "No, sir" to Mr. Still's question, "From either the DNA and the latent lifts or the lack thereof, was there anything that you found that connected my client to the scene of that robbery?" (*Id.* 181:21–24); and "Yes, sir; yes, sir," to Mr. Still's question that "the only thing that [Detective Jones] had that connected in any way [Mr. Still's] client to the scene of that robbery was Mr. Isas' eyewitness identification." (*Id.* 181:25–182:3 (alterations added)).

During closing arguments, the subject of teeth was brought up again.  The State argued in closing, "Now, throughout the trial you all have had an opportunity to see his teeth, his buck teeth.  Would that be something that [Mr. Isas] would forget?" (*Id.* 216:5–7 (alteration added)).

---

[7] The state court reviewed the photo-lineup at the postconviction evidentiary hearing and noted the lineup showed six men, "similar in appearance to the Defendant, with their mouths closed."  (Order on Claims 3 and 4 of Rule 3.850 Motion 4).

In his closing, Mr. Still argued the case boiled down to one eyewitness identification, questioned

whether Mr. Isas had an accurate memory, and discussed Detective Jones's testimony as follows:

> And you remember I asked him, I said, "but detective, you said that the robber
> had a black ski cap." Is that in the picture? No, that was not in the picture. Is
> [sic] the camouflage pants in the picture? No. It is just a picture of the face. Was
> the black shirt in the picture? No. I didn't see that. Were you able to determine
> the big teeth? Because Mr. Isas said "sunglasses," "black male." Well, that
> narrows the population down, doesn't it? And he said, "big teeth," okay. Now,
> what surprised me on that is that he didn't see the gold teeth, but he saw big teeth.

(*Id.* 223:19–224:3). Mr. Still brought up the gold teeth again later in his closing, arguing:

> There was [sic] no fingerprints. The brown sunglasses with the gold frames. The
> only paramount factor that Mr. Isas said that he used for identification he could
> remember about this person was the brown sunglasses with the gold frames.
> There is no ski cap. No black shirt. No camouflage pants. And the issue of my
> client having big teeth and what everybody saw was that he had gold teeth and
> even they talked about gold teeth, but it wasn't pointed out. That is such an
> obvious factor, not that they were big, but it was gold teeth. That never came up.

(*Id.* 225:23–226:6). In its rebuttal closing, the State responded:

> There is a big difference between describing someone and identifying them. And
> it is hard, you know, when you are asked to describe someone to get exactly every
> single physical characteristic, but when you see them, you know, that is the
> person, and that is exactly what happened with Hugo Isas. . . . He described the
> race and he described the teeth. Members of the jury, we are not born with gold
> teeth. That is a decorative thing that we sometimes choose to put on ourselves if
> we want to. Is the fact that Hugo Isas says that he didn't have gold teeth — this
> defendant probably didn't have gold teeth on the night of the incident, but he did
> have an over-bite. He did have buck teeth. So to say that Hugo Isas and his
> identification is [sic] unreliable because he didn't describe the gold teeth is just
> not fair, it is not right, because again it is a big difference to describe someone
> than to identify him. And once he saw the robber he remembered him.

(*Id.* 229:25–230:25 (alteration added)).

At the postconviction evidentiary hearing, Mr. Still testified he did not remember having

a discussion with Wilson about when or where he got his gold teeth (*see* Feb. Evidentiary Hr'g

Tr. 12:4–6);[8] he did not attempt to contact Wilson's dentist to try and obtain dental records for the gold teeth (*see id.* 12:9–13); and he did not conduct "an investigation to find out when he got the teeth, or how long he had them." (*Id.* 12:21–23). Mr. Still testified he thought Wilson's gold teeth were a "defining characteristic" of Wilson's face and his gold teeth were "going to be a key factor" at trial. (*Id.* 11:5–10). According to Mr. Still, "there were probably three hundred forty-seven other identifying factors that the person couldn't identify, and it boiled down to he said he saw the teeth, but didn't say he saw gold teeth." (*Id.* 17:22–25).

Mr. Still testified it was his trial strategy not to cross-examine Mr. Isas specifically about whether the individual that robbed him had gold teeth or to say anything at all about the gold teeth during the trial, but instead wait until closing arguments to bring it up. (*See id.* 14:3–16 (testifying he "hope[d] that [he] would have been clever enough to keep that for closing argument")). Mr. Still testified he was aware of "the instruction of the Court" that jurors are not allowed to consider any statements made by counsel in closing arguments as evidence, but that his plan to raise the gold teeth during closing was "a matter of strategy. The defendant was sitting over at counsel's table, with the jury looking at him for a couple of days with gold teeth." (*Id.* 14:17–15:6). Finally, Mr. Still testified the State wanted to have Wilson show his teeth to the jury during the trial, but that it was never actually done because it came up at the end of the day, and then the following day it was not brought up again and counsel went in to closing arguments. (*See id.* 15:7–22). Mr. Still testified showing the jury Wilson's teeth "would have worked right into our strategy, because he had gold teeth, and anyone that would have seen his

---

[8] Wilson testified at the evidentiary hearing he told Mr. Still "[his] key" was "the gold teeth, and because of the overbite. The overbite and the gold teeth are permanent implants from 2001." (Feb. Evidentiary Hr'g Tr. 66:1–4 (alteration added)). Wilson also testified he told Mr. Still about prior prison photos Mr. Still could use in evidence to show he had gold teeth prior to the robbery (*see id.* 66:13–15), and asked Mr. Still to get his dental records. (*See id.* 66:8–10).

teeth — his mouth and his teeth are kind of visual — then they would have seen that." (*Id.* 15:23–16:3).

"The question of whether an attorney's actions were actually the product of a tactical or strategic decision is an issue of fact, and a state court's decision concerning that issue is presumptively correct." *Ferrell v. Hall*, 640 F.3d 1199, 1223 (11th Cir. 2011) (internal quotation marks and citation omitted); *see also* 28 U.S.C. § 2254(e)(1) ("[A] determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." (alteration added)).  The Court agrees with Judge O'Sullivan that Wilson has not rebutted the presumption of correctness with respect to the state court's factual determination that Mr. Still's handling of how to use the fact of Wilson's gold teeth was the product of a tactical or strategic decision.  (*See* Report 56).  Nothing in Wilson's Objections refutes this finding, but this does not end the inquiry.

"[T]he question of whether the strategic or tactical decision is reasonable enough to fall within the wide range of professional competence is an issue of law not one of fact." *Ferrell*, 640 F.3d at 1223 (alteration added; internal quotation marks and citation omitted).  Having ruled on the merits of Wilson's claim, the state court's ruling receives deference under the AEDPA and can only be disturbed if it was an unreasonable application of clearly established federal law. *See Harvey*, 629 F.3d at 1243.  "Under the doubly deferential judicial review that applies to a *Strickland* claim evaluated under the § 2254(d)(1) standard," the "question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable — a substantially higher threshold." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (internal quotation marks and citations omitted).

"[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington*, 562 U.S. at 102 (alteration added; citation omitted).

"Under § 2254(d), a habeas court must determine what arguments or theories supported or, . . . , could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]." *Harrington*, 562 U.S. at 102 (alterations added). The state court order denying Wilson's motion for postconviction relief on this claim notes Mr. Still has been an attorney since 1973, specializes in criminal defense work, and has represented thousands of people accused of crimes and tried approximately 150 jury trials. (*See* Order on Claims 3 and 4 of Rule 3.850 Motion 4). The order notes Mr. Still encouraged Wilson "to 'show' his gold teeth to the jury throughout the trial as they sat at defense table;" Mr. Still's strategic decision not to cross-examine Mr. Isas about the gold teeth, so as to avoid "risking that the victim might 'remember' or change his testimony;" and Mr. Still's decision to save the gold-teeth argument for his closing. (*Id.* 4–5). The state court found Mr. Still's strategy was reasonable and did not justify postconviction relief. (*See id.* 5). The Florida Third District Court of Appeal issued a *per curiam* opinion affirming the state court's ruling. (*See* Third District Court of Appeal Order Affirming Denial of Rule 3.850 Motion).

The Court finds the state court's denial of Wilson's claim was neither contrary to, or an unreasonable application of *Strickland* or other clearly established federal law, nor was it based on an unreasonable determination of the facts. Although Wilson's trial counsel did not specifically testify he was concerned Mr. Isas might change his testimony or "remember" Wilson's gold teeth if Mr. Still brought the matter up on cross-examination, the state court's extrapolation of this concern based on Mr. Still's testimony at the evidentiary hearing that he

wanted to save the issue of the gold teeth for the closing, taken together with the fact Mr. Isas made an in-court identification of Wilson as the individual who robbed him and could have tried to explain this away, is not unsubstantiated or unreasonable.

While Mr. Still did not put forth any affirmative evidence to establish the theory of mistaken identity, this strategy, albeit an unsuccessful one, was not so egregious that no competent counsel would have acted similarly. It is undisputed Wilson has a prominent overbite, or "buck teeth" as the phrase is used in the trial court proceedings. As part of his trial strategy, Mr. Still had Wilson looking at the jury and displaying his teeth for the length of the trial. This strategy can be assumed to have been at least minimally successful considering the State, during its closing, noted, "throughout the trial you all have had an opportunity to see his teeth, his buck teeth. Would that be something that [Mr. Isas] would forget?" (Trial Tr. 216:5–7 (alteration added)).

Mr. Still also cross-examined the State's witnesses for any weaknesses and inconsistencies. Mr. Still elicited testimony from Mr. Isas about the primary characteristic upon which he based his identification of the individual who robbed him, namely, his buck teeth. On his cross-examination of Detective Jones, Mr. Still made the point that Wilson's teeth were not shown in the photo-lineup and the only identifying characteristic the victim gave to Detective Jones that matched the photograph of Wilson was that Wilson is black. Having effectively cross-examined the State's witnesses, Mr. Still wanted to save his final "aha" argument — that the State's key witness did not describe Wilson's defining characteristic — for his closing argument. In hindsight, the State's response of injecting skepticism as to when Wilson got his gold teeth in relation to the robbery might have counseled against this strategy, but "the Supreme Court has

time and again counseled against judging trial counsel's performance with the benefit of hindsight." *Harvey,* 629 F.3d at 1238 (citation omitted).

In his Objections, Wilson argues Mr. Still's "failure to conduct a reasonable investigation into the date [Wilson] had his gold caps implanted surely establishes ineffectiveness." (Objections 15). "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgment." *Strickland*, 466 U.S. at 691 (alteration added). Although Mr. Still testified he did not recall having a discussion with Wilson about when or where he got his gold teeth (*see* Feb. Evidentiary Hr'g Tr. 12:4–6), Wilson himself testified he informed Mr. Still he got his overbite permanently gold capped in 2001, prior to the robbery, and there were dental records and prior prison photos to establish this fact. (*See id.* 66:1–15). This is not a case where a pretrial investigation would have turned up new information previously unknown to either Wilson or Mr. Still, and Mr. Still's strategic decision was not, as Wilson argues, made in ignorance.

Moreover, Mr. Still's strategy was not patently unreasonable. Unlike the defense counsel in *Cabrera v. State*, 766 So. 2d 1131 (Fla. 2d DCA 2000), whose performance was found ineffective, Mr. Still did not forego Wilson's only viable legal defense. Rather, Mr. Still pursued the defense's theory of misidentification, admittedly in a different manner than Wilson argues, in hindsight, would have been most effective. Wilson also relies on *Hardwick v. Crosby*, 320 F.3d 1127 (11th Cir. 2003), and *Young v. Zant*, 677 F.2d 792 (11th Cir. 1982), to argue a tactical or strategic decision is unreasonable if it is based on a failure to understand the law (*see* Objections 14), but there is no indication Mr. Still failed to understand the law.

32

Wilson also contends a proper foundation was required to be laid by Mr. Still before he could argue about the gold teeth in closing argument and Mr. Still's violation of the rules of evidence cannot be held to be sound trial strategy.  (*See id.* 10).  Although cases such as *Kulick v. State*, 614 So. 2d 672 (Fla. 2d DCA 1993), generally support the idea Mr. Still could have pursued a different trial strategy, they do not go so far as to warrant a finding that no competent counsel would have acted as he did, or direct the Court to find the state court's decision should be reversed under the AEDPA's deferential standard of review.

In sum, based on a review of the record, the parties' filings, and the Report, the undersigned agrees with Judge O'Sullivan's recommendation and therefore denies Wilson's claim of ineffective assistance of counsel based on his counsel's failure to prove Wilson had gold teeth before the commission of the underlying robbery.

### 5.  Cumulative Error[9]

In his final argument, Wilson contends "even if the Court were to find the grounds independently lacking in sufficient prejudice to meet the *Strickland* standard for ineffective assistance of counsel, when the synergy of the four grounds is considered, ample prejudice exists to meet and exceed *Strickland*."  (Objections 16).  Assuming, without concluding, the doctrine of cumulative error is cognizable in a federal habeas proceeding, Judge O'Sullivan finds Wilson "failed to show that 'an aggregation of nonreversible errors . . . yield[ed] a denial of a constitutional right to a fair trial, which calls for reversal.'"  (Report 57 (quoting *Hill v. Sec'y, Fla. Dep't of Corr.*, 578 F. App'x 805, 810 (11th Cir. 2014) (alterations added))).  In his Objections, Wilson argues the doctrine of cumulative errors is clearly applicable to claims of ineffective assistance of counsel (*see* Objections 16 (citing *Strickland*, 466 U.S. at 695–96)), and

---

[9] The Court may deny relief on the merits of a claim even if that claim has not been exhausted in state court.  *See* 28 U.S.C. § 2254(b)(2).

Case No. 14-21619-CIV-ALTONAGA/O'Sullivan

the failure of Wilson's trial counsel to present evidence of Wilson's gold teeth, failure to investigate, and failure to produce trial alibi witnesses, entitles Wilson to habeas relief.  (*See id.* 17).

The undersigned is not persuaded by Wilson's argument that the cumulative error doctrine necessarily applies, particularly where the Eleventh Circuit has repeatedly noted its uncertain application in decisions issued post-*Strickland*.  *See Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 n.3 (11th Cir. 2012) ("We need not determine today whether, under the current state of Supreme Court precedent, cumulative error claims reviewed through the lens of AEDPA can ever succeed in showing that the state court's decision on the merits was contrary to or an unreasonable application of clearly established law."); *Hill*, 578 F. App'x at 810 ("In a previous case, we analyzed a cumulative error claim by assuming without deciding that such a clam in the context of ineffective assistance of counsel would be cognizable in the habeas context, and we affirmed the denial of the claim on the merits. . . . As in *Morris*, we need not decide the issue here because, even assuming a claim of cumulative error is cognizable in federal habeas proceedings, Hill would not be able to satisfy that standard." (citing *Morris*, 677 F.3d at 1132 n.3)).  Nevertheless, assuming it does, based on the foregoing analysis and determinations of Wilson's individual claims of ineffective assistance, the Court denies Wilson's cumulative error claim.  *See Morris*, 677 F.3d at 1132 ("This Court has made clear that where there is no error in any of the trial court's rulings, the argument that cumulative trial error requires that this Court reverse the defendant's convictions is without merit." (alterations, internal quotation marks, and citations omitted)).

### III. EVIDENTIARY HEARING AND CERTIFICATE OF APPEALABILITY

In the Petition, Wilson requests the Court hold an evidentiary hearing on all of his claims

Case No. 14-21619-CIV-ALTONAGA/O'Sullivan

of ineffective assistance of counsel because the state court did not hold an evidentiary hearing as to claims 1 and 2, and, although the state court held an evidentiary hearing on claims 3 and 4, it left material facts in dispute.  (*See generaly* Pet.).  The Report finds Wilson failed to demonstrate the existence of any factual dispute warranting a federal evidentiary hearing as to any of his claims pursuant to Section 2254(e)(2)(B).  (*See* Report 23).  In his Objections, Wilson repeats his general request for a hearing without demonstrating one is warranted.  Based on a review of the record, the briefing, and the Report, the undersigned concurs with Judge O'Sullivan and denies the request for an evidentiary hearing.

The Report does not provide a recommendation regarding a certificate of appealability.  Nonetheless, "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2) (alteration added).  The U.S. Supreme Court has explained the limited circumstances when a certificate of appealability should properly issue after the district court denies a habeas petition:

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (alteration added; internal citation omitted).  The Court finds the issuance of a certificate of appealability is not warranted here.

## IV. CONCLUSION

The undersigned has conducted a *de novo* review of the record, the parties' filings, and the Report with respect to the objections raised by Petitioner, and has reviewed Judge O'Sullivan's analysis of the remaining claims for plain error.  For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that the Petition **[ECF No. 1]** is **DENIED**.  A certificate of appealability shall not issue.  The Clerk of the Court is directed to **CLOSE** this case, and any

Case No. 14-21619-CIV-ALTONAGA/O'Sullivan

pending motions are **DENIED as moot**.

      **DONE AND ORDERED** in Chambers at Miami, Florida, this 8th day of April, 2015.

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:    Magistrate Judge John J. O'Sullivan
       counsel of record